Good morning, judges. I'm Karen Stolzberg and I'm representing Dilys Blair-Bain, who's the applicant for disability benefits in this case. And I would like to start out by addressing the supplemental, at least part of the supplemental, authority that was submitted by a defendant, particularly the case of Sam v. Astrue, which is found at 550 F. 3rd, 808, which is a recent Ninth Circuit case that deals with Social Security Ruling 8320. Social Security Ruling 8320 provides that when there is a remote onset date and it's difficult to establish when a claimant became disabled, that the ALJ has the obligation to call the assistance of a medical expert to help infer onset date. In Sam, the court found that the ALJ had no obligation to consult with a medical expert unless and had none unless there was an explicit finding or substantial evidence that the claimant was disabled at some point after the date last insured. In the Sam case, the ALJ found that there were very sparse records, medical records, before the date last insured, and none of them dealt with the disabling conditions. The case at bar here is extremely different from that. We have substantial evidence in this case that the claimant is disabled from both treating and examining specialists. What do you do about Dr. Sargent? Dr. Sargent, you have to put in context. Dr. Sargent is a family doctor to whom she went. She saw him between March of 1 and August of 1. During the course of that time, he did some tests and observed her symptoms and signs, and based upon that, he referred her to two specialists for further workup. The two specialists are Dr. Diodar and Dr. Kempel, both rheumatologists. Dr. Sargent made a comment early on in his treatment. In fact, I believe it was right within the first or second visit that the judge interpreted as his saying you're not disabled, get on with things. I think that it's very easy to read that in different ways. Doctors don't. That would be up to the ALJ, wouldn't it? I'm not sure. You can interpret it in one of two ways. Isn't that the option for the ALJ then? Even so, you need to put it in context. It came at the very beginning of his treatment of her. Over the course of that five months or so, he found that she had a positive ANA test, which is a very general test indicating that there's inflammation in the body in some place. And he found that she had a rash, and he observed her symptoms, and he listened to her subjective complaints. And based on that, he started wondering if she had a mixed connective tissue disorder, which is a more complex rheumatological disorder. So off she goes to see the specialists. And both of the specialists found that she did indeed have these disorders and that she was disabled. Now, bringing it back to the SAM case, we have two opinions from specialists saying that this person is significantly impaired, and that is substantial evidence. And so the SAM case is not applicable here. I think the real risk in this is that somehow we undermine the intent of 8320 and allow an ALJ to disqualify for one reason or another all of the evidence and then say, well, there's no evidence, so I don't have the obligation to call a medical expert. I think there's great danger in allowing those of us who haven't gone to medical school to make those kind of determinations. And that's why 8320 exists. And I think the language in 8320 is very applicable to this case. If you read defendants' briefs, they're saying that all of the evidence post the last insured date shows that just that she got worse. I think that the other side of that coin is that she had a progressive condition and that it's difficult for doctors to determine exactly what the diagnosis is or exactly why these symptoms of which their patient complains are occurring. And over time, that has become far more clear. That is precisely the situation that 8320 anticipates. So I think that the ALJ's failure to call a doctor to assist her in making determination regarding onset date was significant in this case. Obviously, with respect to the attending physician and consulting physician opinions, the law, social security law, offers great deference to the attending physicians and the consulting physicians. And the case of Oren v. Astro sets out very clearly why and under what circumstances that deference needs to be afforded. There really isn't any contravening evidence in this case. There isn't anyone saying, I don't think that Ms. Blair Bain is disabled. And yet the judge found reasons to basically pitch all of the evidence of disability. And I think that's erroneous. If you want to talk about her specific reasons, she said there's a lack of objective evidence. And I put a chart in the brief that shows what the objective evidence is. It may not be evidence that appealed to her, but it is objective evidence. And it's the meat of the stuff that doctors work with. And it does show that she had a progressive condition. The judge in this case found the ANA testing to be, I guess, unreliable. Again, I'd say we operate at great risk when we allow people without medical backgrounds to decide that a positive test isn't positive enough or good enough. And if you look at the progression of the ANA testing over the course of treatment that we have here, it has progressively worsened to the point where the most recent one that I saw, or at least that I noted, which was in October of 2002, was at the point where it was considered strongly positive. And that was just at the beginning of the time that Dr. Kempel started treating her. And obviously many years have elapsed since then. Do you have any other questions for me I'd be happy to address? Did the ALJ accord any weight to the opinions of the two experts? None. None whatsoever. No. She found reasons to just disregard all of that. You know, her reasons are lack of objective evidence. I don't think that that stands. That they relied only on the plaintiff's subjective complaints. Again, I don't think that that's real. There's substantial objective evidence. She may not have liked it, but there it is. I also, in my brief I mentioned, I think that this idea that doctors' opinions lose validity because they listen to their patients needs to be questioned. I think that doctors do rely greatly on what their patients say. And the fact that someone comes in and says, I have this and I feel that and this hurts and that hurts, isn't a basis for rejecting a medical opinion. If you look at many chart notes, you'll see that doctors structure their notes in what I've been told is called the SOAP format. And it's subjective, objective assessment and plan. And so the subjective complaints are always the first thing that they need to look at. They have to find out what. You don't go in to the doctor and sit there like a bump on a log and expect them to decide what's wrong with you. So subjective complaints, I mean, we do in this process want objectivity and objective testing. But the fact that my client told her doctors how she feels is not a valid basis for discounting their opinion. And then so the other basis she had for throwing out Dr. Temple's report, or his opinions, multiple opinions, was that she didn't like his interpretation of the positive anti-nuclear antibody testing. And, I mean, I don't think any of those are really sufficient. And, again, I'm very concerned that we empower a judge to say, no, none of that evidence is valid, and so I have no obligation under the ruling, therefore. It's just too convenient. Thank you. Thank you. Good morning, Your Honors. David Johnson representing the Commissioner of Social Security, Michael Astru. I'd like to correct what I think is a misapplication of how an ALJ judges subjective complaints and doctors' opinions based on those. It's absolutely correct that doctors' opinions based on subjective complaints are valid and that what a patient has to say to the doctor is important until the ALJ, who has a broader view of the evidence than any doctor does, until that ALJ determines that there's evidence to doubt the credibility of the subjective complaints. When that occurs, then, to the extent the doctor's opinion is based on uncredible complaints, the doctor's opinion may be discounted to that extent. And that's what occurred in this case. Well, but then, so the first thing we have to determine is whether or not the ALJ's rejection, right, of the applicant's testimony was proper. That's right, whether it was supported by substantial evidence and based on the correct legal standards. And in this case, it was. The ALJ looked at the evidence during the period in question. Of course, the claimant has the burden to prove that while she was insured, she was disabled. She couldn't work because of a medical condition. What we have in this case is she had a severe impairment, absolutely. The ALJ labeled it as fibromyalgia. The case law tells us that regardless of the label, if the residual functional capacity contains all the limitations that are supported by substantial evidence, then it's a valid finding regardless of whether other conditions should have been considered severe back at Step 2. So the credibility of the claimant in this case was mainly determined by the lack of objective evidence of limitation, not the lack of objective evidence at all. The lack of objective evidence of limitation as well as the claimant's activities that were inconsistent with her claims. And Dr. Sargent repeatedly through his treatment contrasted not just her claims with what she was doing, but the ALJ pointed out that he made findings that were inconsistent with her claims of limitation. He found full range of motion. He found no evidence of tenderness on repeated examinations. And this was consistent with the records he had from Dr. Becker, who also found the ability to toe and heel stand, to do a deep knee bend and full range of motion, as well as the claimant's alertness, her apparent ability to do mental functioning, including balancing the family finances, as well as what the regulations tell us is an important indicator of the degree of symptom limitation, and that is the amount of treatment she sought. She saw Dr. Becker first in October of 1999. She next saw Dr. Becker in January of 2000. Almost a year later, Dr. Becker's records were transferred to Dr. Sargent. Ms. Blair-Bain contended that she became unable to work in September 30th of 1997. That was when she was laid off because her department was reorganized. The lack of medical treatment during that time was an important indicator that she wasn't experiencing significant functional limitations from her fibromyalgia symptoms. She saw Dr. Becker originally because she twisted her back, and she didn't describe the degree of limitation that she claimed in her testimony. Those inconsistencies, the lack of findings, and certainly the context of Dr. Sargent's analysis, that is no evidence that she's as limited as she claims, and contrary evidence that she was more capable than she claimed. She reinforced that contrary evidence in December of 2002. That was after she'd seen Dr. Diodar, after she'd seen Dr. Kempel, right before her date last insured, she completed a questionnaire for Dr. Burkhart that she always did all the tasks listed on the questionnaire. She wasn't just minimizing her abilities, or her limitations, I should say. She wasn't just minimizing her limitations that she claimed in her testimony. Rather, when she talked to the doctors, she'd tell them about all she could do, and then tell them how limited she was. So the ALJ had valid reasons and substantial evidence for giving less weight to Ms. Blair-Bain's subjective complaints to the physicians. Now, when we look at the opinions of Dr. Diodar and Dr. Kempel, what we find is, also inconsistent with counsel's argument today, the ALJ did give some weight to their opinions. She assessed a residual functional capacity that was less than a full range of light work. This was less than the reviewing physicians from the Disability Determination Service, who are considered experts in the disability litigation process, by the commissioner. The ALJ assessed less capabilities than the reviewing physicians assessed. The examinations of Dr. Diodar and Dr. Kempel, while Ms. Blair-Bain was insured, don't opine specific functional limitations that are inconsistent with the residual functional capacity finding. They're additionally, to the extent they claim she was disabled, which is an issue reserved for the commissioner, those opinions are not supported by the examination findings. Both doctors found nearly full range of motion, once again. Ms. Blair-Bain may feel that she couldn't do anything. The reality is, she was doing what amounted to a full day's worth of work. Dr. Becker said so, Dr. Sargent said so, her treating physicians at the time that she was insured.  Because there has been no finding of disability under another title, as was the case in Armstrong, and because there has been no court finding of disability, as was the case in Delorme, there is no need for a remand for a medical expert to tell us when her disability began. Sam summarizes those two cases and summarizes the Delorme finding as substantial evidence of a disability, and then we need to send it back to find out when it started. Delorme, the appeals court found the claimant was disabled and so sent the case back for a determination of when the onset started. Here, there's been no determination of that, and I would submit to this court there is no basis for a determination of that, so there is no need for a medical expert to infer when an onset occurred. In fact, SSR 8320 uses the word must, when an ALJ must infer an onset date. In this case, there was no need for it. The evidence submitted after the ALJ rendered her decision showed a hospitalization for a mental disorder in 2006, approximately four years after the date last insured, and which Dr. Kempel specifically said had not existed during the insured period. I submit that the ALJ's decision is supported by substantial evidence and based on the correct legal standards, and there is no basis to overturn that decision. Thank you. Just a couple points, Your Honors. On page 8 of the first excerpt of record, the judge states that the undersized time gives the assessment by Dr. Diodar no weight as it is merely a recitation of impairments provided by the claimant. On page 10 of that decision, of the excerpts in her decision, she says based on the totality of the medical evidence, the undersigned gives no weight to the opinion of Dr. Kempel because it's not consistent with or supported with by the evidence of record. So that's pretty clear. Now back to 8320. 8320 does not require that cases go to an appellate court for determination of disability before it applies. These rulings are in place in order to state the policy of the Social Security Administration. 8320 provides specifically with slowly progressive impairments, sometimes impossible to obtain medical evidence, establishing the precise date an impairment became disabling. This is particularly difficult when the alleged onset date and the date last insured are far in the past and adequate medical records are not available. In such cases, it's necessary to infer an onset date from the medical and other evidence that describe the history. It instructs the Social Security Administration to consider, first of all, applicant allegations. Secondly, work history. And then the medical evidence. And then finally it says that at hearing, the administrative law judge should call the services of medical advisor when onset must be inferred. So certainly this is a ruling that is supposed to guide the behavior of the judge at hearing, not upon remand. With respect to Ms. Blairbane's credibility, Ms. Blairbane, unfortunately or fortunately, is one of those people who has a very bright and positive outlook on life. So the question has to be asked, does that ‑‑ does her approach to life affect and ultimately control the way the evidence is going to be viewed? Can you imagine a quadriplegic who has a positive outlook? I just noticed that you're over time by about three minutes. I just wonder if you're still winding up. I'll wind up. This is an important matter. Anything else you want to add? I think sometimes our time limits are pretty draconian. Okay. Why don't you wrap it up in a minute? Oh, I mean, just ‑‑ I think that we ‑‑ unfortunately, I represent people. And there's some of them that are sort of morose and negative, like me. And then there are others who have a positive outlook on life. And people go to whatever they do, carrying that essential personality characteristic. And Ms. Blairbane is an alert and an upbeat person. I don't think that this necessarily means that she doesn't have any problems. And I think that we need to view the evidence in light of that. I think people can go into a doctor and say, hi, doctor, how are you? And I have all these problems. And they could say there's a discrepancy between the affect and the complaints. But that doesn't undermine the complaints. Anything more? No. Thank you. In other words, she's a noncomplainer. Pardon me? She's a noncomplainer. Well, actually, I think that there's evidence in this case that she was shamed and stigmatized by her problems and was not comfortable always talking about them. Thank you. The next matter is Huff v. City of Portland. That's submitted. And now we come to Blough v. Holland Realty. And we have Yasuda v. Sell Equity and Meredith Thu v. Mark Point Realty and Pappas v. Aspen Realty. And maximum argument time, 20 minutes each side. Have you divided up your time? Have you divided your time? Yes, we have. I'll be addressing certain arguments. Mr. Harkin will be addressing certain other arguments. That's an important information that we provide to ourselves. The other lawyers will be here to address any specific questions. Do you have your running shoes on? Let's go.
judges: Pregerson, Rymer, Tashima